May 14, 1993 UNITED STATES COURT OF APPEALS
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-2366

LEONARD J. LEBLANC,

Plaintiff, Appellant,

v.

B.G.T. CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Marianne B. Bowler, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Friedman,* Senior Circuit Judge,

and Cyr, Circuit Judge.

Joseph G. Abromovitz, with whom John G. Balzer and

Abromovitz & Leahy, P.C. were on brief, for appellant.

Richard H. Pettingell with whom Debra A. Joyce and Morrison,

Mahoney & Miller were on brief, for appellee.

May 14, 1993

*Of the Federal Circuit, sitting by designation.

SELYA, Circuit Judge. We must answer today a question
SELYA, Circuit Judge.

of first impression in this circuit and, of late, in the courts

of appeals: Does a person's status as a seaman in service of a

ship necessarily end immediately upon termination of employment,

thereby extinguishing a right to maintenance and cure which might

otherwise be available under general maritime law? We think not.

Because the court below applied a contrary rule, we vacate the

judgment and remand for further development of the record.

I. BACKGROUND

Plaintiff-appellant Leonard J. LeBlanc worked as an

engineer aboard the F/V RESOLUTE, a commercial fishing boat owned

by defendant-appellee B.G.T. Corporation.1 The RESOLUTE set out

from Fairhaven, Massachusetts on September 25, 1991. Shortly

after its departure, the vessel broke down and returned to port

for minor repairs. It then headed back to sea with a

rehabilitated winch and renewed hopes, but, it appears, against

the winds of fortune. The crew's efforts produced few fish.

Appellant grew uneasy in the face of disappointed

expectations. Since his remuneration would reflect both the

value of the catch and the expense of the voyage, he sought to

truncate what had become a relatively unproductive and costly

trip. His importunings placed him at loggerheads with the

1The litigants, who do not agree on very much, have a
difference of opinion as to nomenclature. Although the case
caption and appellant's filings refer to the defendant as "B.G.T.
Corporation," the defendant persists in styling itself "B.T.G.
Fisheries, Inc." This seems to us small beer, and we, following
both alphabetical order and the lead of the magistrate judge, use
the former appellation.

2

captain, and a heated confrontation ensued. Although the parties

vigorously debate the exact content of this war of words

appellant may or may not have been cashiered then and there it

is undisputed that the RESOLUTE turned back, arriving in New

Bedford during the night of October 9. The following morning,

the crew dislodged the catch. The RESOLUTE then made the five-

minute journey to her dock in Fairhaven. Throughout, appellant

continued to perform the ship's work.

Once the vessel docked, appellant, assisted by a fellow

crew member, Peter Lynch, began unloading his gear. During this

process, or shortly thereafter, the captain approached and gave

appellant his "per."2 Another argument erupted. In the course

of this brouhaha, the captain either told or reminded appellant

that he was fired and, at any rate, ordered him to remove his

belongings from the boat. Ten to fifteen minutes later,

appellant slipped while descending the stairs to the engine room

and broke his right foot.

It remains unclear exactly what transpired in the brief

interval between the second imbroglio and the accident. The

parties agree that appellant removed some additional gear that he

routinely kept aboard the RESOLUTE between voyages; but they

disagree as to exactly how he accomplished this feat, i.e.,

whether he exited the vessel during the unloading process or,

2A "per" is a bonus provided to certain crew members, like
the engineer, whose duties include the performance of special
tasks. Appellant did not receive his basic remuneration his
crewman's "share" until a later time.

3

instead, stayed on board and handed his possessions over the side

to Lynch. The record is similarly obscure concerning whether

appellant succeeded in removing all his gear prior to injuring

himself or, instead, as he claimed at trial, had yet to retrieve

his boots from the engine room.

Following the mishap, appellant received maintenance

checks for a period of time. As soon as the employer's attorney

got wind of the accident and suggested that appellant, when

injured, was no longer in the ship's service, the flow of funds

stopped. Appellant then sued, including in his complaint a count

for maintenance and cure under general maritime law. That count

was tried by mutual consent before a magistrate judge. See 28

U.S.C. 636(c)(1) (1988). After a two-day trial, the magistrate

denied recovery for maintenance and cure. LeBlanc appeals.3

II. ANALYSIS

The magistrate reasoned that appellant was not entitled

to maintenance and cure because, as a matter of law, that remedy

cannot attach after termination of employment. Since this was a

bench trial in an admiralty case, the magistrate's findings of

fact are reviewable only for clear error. See, e.g., DiMillo v.

Sheepscot Pilots, Inc., 870 F.2d 746, 749 (1st Cir. 1989);

Clauson v. Smith, 823 F.2d 660, 661 (1st Cir. 1987). However,

3LeBlanc also sued for negligence under the Jones Act, 46
U.S.C. app. 688 (1988), and for unseaworthiness under general
maritime law. These claims remain in drydock. Notwithstanding
the case's odd posture, we have appellate jurisdiction because
the magistrate's order definitively resolved the maintenance-and-
cure count. See 28 U.S.C. 1292(a)(3) (1988) (providing for

liberal interlocutory appeals in admiralty cases).

4

appellant does not claim that the magistrate misperceived the

facts, but, rather, that she applied an incorrect legal standard.

We consider this claim of legal error de novo. See Liberty

Mutual Ins. Co. v. Commercial Union Ins. Co., 978 F.2d 750, 757

(1st Cir. 1992); Dedham Water Co. v. Cumberland Farms Dairy,

Inc., 972 F.2d 453, 457 (1st Cir. 1992).

A

Before addressing the merits of the appeal, we limn the

seascape against which it arises. From time immemorial, the law

of the sea has required shipowners to ensure the maintenance and

cure of seamen who fall ill or become injured while in service of

the ship. See, e.g., 1B Ellen M. Flynn et al., Benedict on

Admiralty 41-42 (6th ed. 1993) (finding the requirement extant

in the Laws of Oleron and other ancient admiralty codes). The

duty to provide maintenance and cure is today a firmly entrenched

accouterment of general maritime law. See, e.g., Aguilar v.

Standard Oil Co., 318 U.S. 724, 726 (1943); The Osceola, 189 U.S.

158, 175 (1903).

The term "maintenance and cure" refers to the provision

of, or payment for, food and lodging ("maintenance") as well as

any necessary health-care expenses ("cure") incurred during the

period of recovery from an injury or malady. See, e.g., Aguilar,

318 U.S. at 730; Calmar Steamship Corp. v. Taylor, 303 U.S. 525,

528 (1938). As the label implies, the right is curative in

nature and is thus to be distinguished from other admiralty

rights, such as the right to recover lost wages or the right to

5

recover for a shipowner's negligence, which are compensatory.

See Aguilar, 318 U.S. at 730. The right to maintenance and cure

attaches largely without regard to fault; a seaman may forfeit

his entitlement only by engaging in gross misconduct. See, e.g.,

Calmar, 303 U.S. at 527-29. And, moreover, once the right to

maintenance and cure has attached, the injured employee's

entitlement continues, even after termination of service, until

he is "so far cured as possible." Farrell v. United States, 336

U.S. 511, 518 (1949); accord Clauson, 823 F.2d at 661 n.1.

Developed though the doctrine may be in some respects,

its scope has never been precisely delineated. While it is

common ground that the right is available only to a "seaman" who

is "in service of the ship" at the time an injury or illness

eventuates, see Aguilar, 318 U.S. at 732; Osceola, 189 U.S. at

175, the meaning of these imbricated terms has evolved piecemeal

over many decades and attempts at further refinement typically

have been imbued with the factual residuum of particular cases.

See, e.g., McDermott Int'l, Inc. v. Wilander, 111 S. Ct. 807,

814-16, 818 (1991); Senko v. LaCrosse Dredging Corp., 352 U.S.

370, 374 (1957).4 Thus, there are lingering questions as to the

exact manner in which the right to maintenance and cure

4Although the cited cases involve the Jones Act, 46 U.S.C.
app. 688, general maritime law and the jurisprudence of the
Jones Act have largely evolved in tandem. See Wilander, 111 S.

Ct. at 810-11. Moreover, those falling within the prophylaxis of
the Jones Act are also among the class of persons who are
afforded the primary protections of general maritime law, of
which maintenance and cure is a prime exemplar. See 1B Flynn et

al., Benedict on Admiralty, supra, 44.

6

interfaces with the employment relationship. It is, for example,

still unsettled whether the right to maintenance and cure is

coterminous with, and a contractual attribute of, employed

status, or, instead, whether the right retains a measure of

independent force. See 2 Martin J. Norris, The Law of Seamen

26:10 (4th ed. 1985) (collecting cases).

The instant case requires us to explore these uncharted

waters, for B.G.T. contends, and the magistrate apparently

believed, that termination of employment, in and of itself,

necessarily and always prevents subsequent attachment of a right

to maintenance and cure. We reject this thesis, concluding that

the right to maintenance and cure stems from the employer-

employee relationship but is not in all circumstances completely

coextensive with it. As we explain below, a number of different

considerations undergird this conclusion.

B

One pylon upon which our holding rests is an

appreciation of the historical purpose of maintenance and cure.

A common thread running through the reported cases, some of them

centuries old, is that maintenance and cure must always be viewed

as an alleviatory remedy. Seamen should receive it because the

nature of their employment necessitates their exposure to the

peculiar hazards of seafaring life while at the same time leaving

them utterly dependent on the ship, which serves as the very

framework for their existence. See, e.g., Farrell, 336 U.S. at

514-16; Aguilar, 318 U.S. at 731-34; Harden v. Gordon, 11 F. Cas.

7

480, 483 (C.C.D. Me. 1823) (No. 6,047) (Story, J.); see also

Wilander, 111 S. Ct. at 817 (stating that a seaman's remedies

grow out of "his peculiar relationship to the vessel, and . . .

the special hazards" of seafaring) (citation and internal

quotation marks omitted). Because it was feared that without the

right to maintenance and cure as an inducement few might

willingly devote themselves to a way of life that would both

render them at risk and leave them friendless in the face of the

assumed risk, see Calmar, 303 U.S. at 528; see also Macedo v. F/V

Paul & Michelle, 868 F.2d 519, 521 (1st Cir. 1989) ("The

obligation for maintenance and cure arose, historically, from the

irresponsible behavior of shipowners who set disabled seamen

ashore at foreign ports to shift for themselves."), the benefits

of maintenance and cure have not been limited to victims of

predictable shipboard injuries. For instance, in ruling that a

seaman injured while on shore leave could receive maintenance and

cure, Justice Rutledge wrote:

The voyage creates not only the need for
relaxation ashore, but the necessity that it
be satisfied in distant and unfamiliar ports.
If, in those surroundings, the seaman . . .
incurs injury, it is because of the voyage,
the shipowner's business. That business has
separated him from his usual places of
association. . . . In sum, it is the ship's
business which subjects the seaman to the
risks attending hours of relaxation in
strange surroundings. Accordingly, it is but
reasonable that the business extend the same
protections against injury from them as it
gives for other risks of the employment.

Aguilar, 318 U.S. at 734. This historical perspective a

seaman's lifestyle makes him dependent on the ship while

8

simultaneously ensuring his exposure to the variegated risks of

seafaring, thus warranting an alleviatory remedy is what stands

behind, and gives meaning to, the black letter rule that seamen

who are, broadly speaking, in the ship's service when injured

merit maintenance and cure.

C

A second pylon upon which our holding rests goes hand

in glove with this historical perspective. Linguistically, the

entitlement to maintenance and cure must not be defined

grudgingly. While the "seaman in service" language has at times

appeared to acquire a restrictive gloss, we believe that any

meaningful interpretation of the phrase must remain moored to

maintenance and cure's core purpose: palliating the

disadvantages of seafaring life. Thus, the nature of the right

require[s] that it be not narrowly confined
or whittled down by restrictive and
artificial distinctions defeating its broad
and beneficial purposes. If leeway is to be
given in either direction, all the
considerations which brought the [right] into
being dictate it should be in the sailor's
behalf.

Aguilar, 318 U.S. at 735.

It is for this reason that a certain expansiveness

rightfully attends determinations of whether a person is a seaman

in service of the ship. To cite one example, we recently ruled

that a sailor injured at home on a Sunday was entitled to

maintenance and cure although his ship was not due to sail until

the following Tuesday, observing that "the captain could have

changed his mind and decided to sail Monday and required

9

plaintiff to do the preparatory boat work Sunday, holiday or

not." Macedo, 868 F.2d at 520-21. As this illustration makes

clear, if a person is enduring circumstances which, in a rather

general sense, further the ship's purposes, he may well be deemed

in the ship's service. Accord Farrell, 336 U.S. at 516 (holding

that a seaman is in the ship's service when he is generally

answerable to the call of duty).

The Supreme Court's most recent visit to these straits

exemplifies the same strain of interpretive generosity in a

slightly different context. In Wilander, an employee whose

duties consisted of supervising the painting of a sea-bound

drilling platform was injured. He sued, seeking a seaman's

remedies. The Court, refusing to impose a requirement that, to

be a seaman, one must aid in the navigation of a vessel,

concluded instead that "[t]he key to seaman status is employment-

related connection to a vessel." Wilander, 111 S. Ct. at 817.5

In sum, the motivational impetus behind maintenance and

cure dictates availability of the anodyne whenever a plaintiff's

5It can, of course, be argued that cases dealing with the
question of who qualifies as a seaman, see, e.g., Wilander, 111

S. Ct. at 807, are distinguishable. However, the two most
frequently asked questions in seamen's cases Who is a seaman?
Was the seaman in service of the ship? overlap. The former
question usually reduces to asking: How connected with the
ship's function must a person's duties be in order for the mine
run of rights under maritime law to attach? The latter question
usually reduces to asking: How connected with the ship's
function must the injury-inducing circumstances be in order for
such rights to attach? In our estimation, the answers to both
questions shed light upon the quandary we face here, namely,
whether it is necessarily true that a seaman in service of the
vessel instantly loses that status upon discharge.

10

injury or illness occurs amidst circumstances endured in

furtherance of, and as a result of, an employment, the duties of

which help accomplish the mission of a vessel in navigation.

This formulation makes clear that, while the right to maintenance

and cure stems from a person's employment, there is no reason to

assume that the right and the employment are conterminous with

each other. Indeed, the decided cases indicate the contrary.

See Aguilar, 318 U.S. at 730 (explaining that the right to

maintenance and cure arises "as an incident of the marine

employer-employee relationship"); Cortes v. Baltimore Insular

Line, Inc., 287 U.S. 367, 371 (1932) (explaining that the right

to maintenance and cure "has its source in a relation which is

contractual in origin").

D

A third pylon on which our holding rests reflects a

policy judgment. We recognize that the possibility of

maintenance and cure attaching will end in most instances when

the employment relationship expires. But, this need not

invariably be the case. We are of the opinion that taking a

mechanical approach, as appellee urges, would as a matter of

policy be incompatible with the Court's repeated eschewal of

sharp-edged rules limiting seamen's rights. See, e.g., Wilander,

111 S. Ct. at 817-18; Desper v. Starved Rock Ferry Co., 342 U.S.

187, 190 (1952).

What is more, a strict cut-off point of the sort urged

by appellee would sometimes run at cross purposes with the

11

historical antecedents and definitional imperatives of

maintenance and cure. See supra Parts II(B), (C). We think this

is so because the life of a seaman requires that he be drawn into

the separate world of the ship and subjected to the unique risks

present therein. If he is terminated while still in that realm,

the separation and its risks which are, after all, the twin

rationales for providing maintenance and cure do not instantly

evaporate. Nor, therefore, does the seaman's persona change,

like Cinderella at the stroke of twelve, from a servitor of the

ship to a landlubbing interloper. Rather, the title "seaman"

must remain attached at least until the individual has finished

his shipboard tasks (unless duly relieved of them) and had a

reasonable chance to exit from the maritime realm, or, put

another way, for so long as the twin rationales remain in force.

Just as the Court deemed Aguilar a seaman in service of the ship

because the risks inherent in his situation were necessitated by

the ship's business, see Aguilar, 318 U.S. at 734, so, too, a

person cashiered while on board a vessel remains a seaman

furthering its purposes at least until he is afforded reasonable

time and opportunity for disembarkation.

E

The last pylon on which our holding rests is hewn from

the caselaw. There is a venerable court of appeals decision

directly on point in which the plaintiff, after being fired,

injured himself while leaving the ship. The Fourth Circuit held

that

12

the obligation of the ship to furnish
maintenance and cure attaches to accidents
which happen in the brief interval between
the time a seaman is paid off and formally
discharged and the subsequent time at which,
in ordinary course, he actually gets
physically away from her. He went on her as
a seaman, and for the purpose in hand he did
not cease to be one until he was safely off
her.

The Michael Tracy, 295 F. 680, 681 (4th Cir. 1924). We believe

that this statement of the law continues to shine brightly,

undimmed by the passage of time.6

We discern further decisional support for our

conclusion in the closely related area of workers' compensation

law. Although statutes differ from state to state, the general

rule stipulates that "coverage is not automatically and

instantaneously terminated by the firing or quitting of the

employee" but extends for a reasonable period thereafter so that

the employee may "wind[] up his affairs and leave[] the

premises." 1A Arthur Larson, The Law of Workmen's Compensation

26.10 (1993) (collecting cases); see also id. 26:30-26:40

(indicating that a "reasonable period" incident to severance of

employment encompasses time to pick up a paycheck and retrieve

6B.G.T. suggests that Fisher v. Cleveland Cliffs Iron Co.,

1975 A.M.C. 1570 (W.D. Pa. 1975), a case in which the district
court abjured the rule of Tracy, is the beacon by which we should

steer. We disagree. First, Fisher's reasoning depends upon

statements (dicta in decisions and passages in commentary)
treating with unrelated questions. See id. at 1577-78. Second,

none of this rumination actually rules out recovery by recently
fired employees. See id. On the whole, Fisher is unsupported by

the authorities upon which it purports to rely. Hence, we, like
the commentators, see, e.g., 2 Norris, supra, 26.31, consider

Tracy more persuasive.

13

personal effects); Elmer H. Blair, Reference Guide to Workmen's

Compensation 5:03 (1974 & Supp. 1993) ("When a workman is

discharged, the right to compensation as an employee is not lost

until he has had a reasonable time to collect his pay and his

personal belongings, and leave the premises of his employer.").

We think the presence of this "reasonable period"

standard in workers' compensation law takes on a special

significance for our purposes because an injured seaman's

entitlement to maintenance and cure is widely thought to impose

"a broader liability than that imposed by modern workmen's

compensation statutes." Aguilar, 318 U.S. at 732; see also 2

Norris, supra, 26:40 ("Maintenance and cure under the general

maritime law is far more liberal in its application than are most

of the present workmen's compensation acts.").

F

We need go no further. The four pylons we have

described form an integrated foundation. Building on that

foundation, we hold that the right to maintenance and cure made

available by general maritime law to seamen injured or falling

ill while in service of the ship may attach after termination of

employment so long as the triggering event takes place within the

period of time reasonably needed for the accomplishment of tasks

in general furtherance of winding up the seaman's employment

the prototypical examples being removing one's belongings,

quitting the ship, or implementing direct orders given at the

time of discharge.

14

In the case at hand, the magistrate judge applied a

different, incorrect legal standard. Moreover, the record is not

sufficiently developed to allow us to resolve the controversy by

regrouping the available findings of fact along the proper legal

matrix.7 The case must, therefore, be remanded for further

consideration in light of this opinion, and for such further

proceedings as may be required. Although it is apparent that the

entire case need not be retried, we in no way intend to limit the

scope of the magistrate judge's inquiry on remand, but leave that

to her informed discretion. In the same vein, we see no reason

for the interposition of a new trier.

Vacated and remanded. Costs to appellant.

7Without attempting to be all-inclusive, we cite two
examples of potentially important uncertainties. (1) The record
is inscrutable with regard to whether LeBlanc, after the second
imbroglio, alighted from the RESOLUTE, and then returned, or
whether he remained on board. (2) There is some dubiety as to
whether LeBlanc, at the time of his injury, was carrying out a
direct order to remove his gear from the ship. The magistrate
made no clear finding on either point, nor did she address the
question of when LeBlanc's injury occurred with respect to the
reasonable period of time needed to wind up his legitimate
business on board the RESOLUTE.

15